Good afternoon your honor. Christopher Morris on behalf of plaintiff and appellant Rochelle Nishimoto. May it please the court. Justices, on September 24th 2016 Jason Nishimoto swallowed between 30 and 60 Klonopin, a whole bottle of Klonopin. This was not the first time Mr. Nishimoto had engaged in self-harming behavior. He was taken to the jail and on September 27th he was evaluated by nurse Brantman. The salient issue before the district court and before the court today is whether or not nurse Brantman appreciated the obvious suicidal risk and suicidal tendencies that attended Jason Nishimoto while he was incarcerated. And the question that we need to ask is whether or not the district court viewed all the evidence in the light most favorable to plaintiff when the court dismissed Miss Brantman from this matter. We'll submit to the court that in fact the district court did not. And I would like to discuss some of the more probative pieces of evidence that the court admitted yet did not evaluate. May I stop you for a moment Mr. Morris. Will you be addressing the question of the exclusion of the evidence? That is the matter is that the judge said that had not been adequately supported. Yes sir. Well I think that the case doesn't rise and fall on the exclusion only because there was evidence that was admitted that mirrors that evidence that mirrors those deposition testimonies. So I don't think the case even though I do disagree with the court's analysis in that I don't think the case rises and falls on that. So may please I'll continue with discussing the evidence the court did allow it. Just to clarify when we're talking about what is the evidence of or what the genuine issue material fact is that you say the evidence raised. What exactly are we talking about and why does that why is that a key element for Ms. Nishimoto's 1983 claim? Can you just start with that? Sure so the key evidence is whether or not the suicidal risk was appreciated such that she initiated the inmate safety protocol. And the failure to do that would have been a constitutional tort? Correct because without appreciating the suicidal nature then she doesn't she is deliberately indifference to his suicidal risk. And if you and I think the key piece of evidence on that if you look at ER 1494 in ER 1494 the decision tree that's attended to the initiation of the inmate safety protocol set forth and the first thing they do your honors is they take away his garments and they take away his bedsheets. Jason Nishimoto hung himself. And if the inmate safety protocol had been initiated he would not have been in a position to harm himself like he was. The first thing you do when you have a suicidal risk is you take away the garments and you take away the bedsheets. Jason Nishimoto hung himself on September 27, 29 excuse me, two days after he was seen by Ms. Brampton. Am I correct though that Nurse Brampton's role in this was to the degree it's disputed to whether or not she informed those persons who would make that kind of choice where Jason should be placed? Correct. That is to say the decision tree really was something that the county had to deal with and the decision tree did depend to some degree on availability of beds and that sort of thing which was beyond her control. Well the decision tree doesn't hinge on the placement. You can be you can start that decision tree you can start the inmate safety protocol whether you're in a MOB cell or whether or not you're in an EOH cell or an absent cell. So the question really is did she appreciate the suicidal nature such that the inmate safety protocol was initiated? You've been using, I'm sorry, I just may add one thing. You've been using the word appreciated and I know where it comes from in terms of the record but I'm not sure that the use of the word appreciated as a term of art is the same kind of appreciated that perhaps a deputy sheriff would have. And so I think I want to understand for purposes of the constitutional tort what it is that she would be obligated to do. She would be obligated to recognize the suicidal risk and take appropriate steps to ameliorate that risk. And that would require conveying the risk of suicide because she is the mental health provider and they all depend on her to recognize that risk. It would depend on her conveying that to Nurse Villasardo and the other members of the other medical staff. Her constitutional tort consists of failing to convey that information. I would submit that it consists of failing to fact. So can you now tell us what's the strongest evidence that there was a genuine issue of material fact as to Nurse Brantman failing to convey concerns about his placement or his suicide-related needs? I think there are two pieces of evidence, Your Honor, that are equally as probative on that issue. The first one is her note itself. Her note itself fails to mention anything about suicide. In fact, it mentions that he denied suicidal ideation. It denies that he's suicidal and justifies the non-placement of him in a safety cell because... Is that inaccurate though? Didn't he denied suicidal ideation? Oh no, that's accurate. He did deny it to the extent that as somebody who has just ingested a lethal dose of prescription drugs could deny it. Yes, he did deny it. But the note is very clear that she characterizes it as an accidental overdose and that he is not suicidal. He is withdrawing. He's withdrawing. Your point though is also that you have this three page detailed note that doesn't describe the conversation that Nurse Brantman said occurred and on which the district court relied. And you're saying an inference can be drawn that because this three page note doesn't have a report of that conversation. It didn't happen, right? The note is probative because A, it disputes the fact that she recognized the suicidal risk and B, that she did not convey it because there's nothing in the note that would indicate that she conveyed that to Nurse Filosardo at all. In fact, the note is silent on that. And if in fact she had, you would have initiated the inmate safety protocol, which is another important causation factor, which would have required him to be seen by a psychiatrist within 24 hours, which would have been the interim time when he killed himself. But she put in the note, oh, we'll come back to the clinic in 48 hours. So this whole notion that she in fact made this recommendation is really belied and denied by the note itself. But isn't it the case that the protocol recommends placement in a safety cell only for those inmates who one, verbalize, the inmates verbalize the act of suicidal ideation. And that's not the case here. Correct. And or those who are intoxicated or belligerent. Those are the ones who are absolutely under the protocol to be referred. Your Honor, you're correct. The placement is important, whether your safety cell or some of the other step down units. But what Vista had was a step down unit for his placement. And whether you're in a safety cell or left somewhere else, the important touchstone to this whole case is the initiation of the inmate safety protocol, because that would have taken away his garments, taken away his bed sheets, and it would have alleviated and ameliorated the risk of suicide by hanging was what would happen. Didn't she make such a recommendation that is for a step down kind of treatment? Your Honor, she made a recommendation for the MOB, which is a medical observation bed, but a MOB without inmate safety protocols. That's the it's like you're in the hospital. You get vitals twice a day, and the nurses are outside. Inmate safety protocol in a medical bed means you take away your garments and you take away your bed sheets. And she was required to make that recommendation. Yes, that's our contention, Your Honor. And I think that's if I look carefully at the protocol, it will tell me that. Yes, sir. It's at 1494 of the ER. And it's the decision tree. And it's under the actively voicing suicidal ideation, but it is on the moderate scale. The first thing they do is to take away the bed sheets and the garments. That's she makes the recommendation. She doesn't take away the bed sheets because she's simply the intermediary. Correct. She has to make that recommendation and the staff does that kind of thing. And I think going back to the other question, what is the most probative? The second thing I think is is Deputy Johnson's testimony. The court did strike this deposition testimony, but it didn't strike this testimony. The clerk is the Citizen Law Enforcement Review Board. And that testimony mirrored exactly what he said in his deposition. And that was happy for the district court. I think the opposing counsels as it wasn't presented in opposition to summary judgment. Yeah, no, it was. It was Exhibit D to plaintiff's summary judgment motion. And it can be found at the record at 4821. And in Deputy Johnson's clerk testimony, he said that Nurse Brentman was concerned about withdrawing fever, chills and vomiting, and that because he didn't voice suicidal ideation, she didn't feel that safety cell placement was appropriate and that it was a medical issue only that she appreciated. And that was his clerk testimony. And that was three months after Jason Nishimoto, six months after Jason Nishimoto had died. And and so that that testimony was clearly before the district court that on its face disputes and calls into question. And again, you take the evidence in the light most favorable to plaintiffs. You've got to take all the evidence. And in that connection, though, isn't it a bit over reading of the third testimony here? It was a two to three minute conversation in which essentially the deputy said, I really didn't hear what was going on at that time. And what he basically said is she was a contractor and walked around the building. That was that was the nature of the relationship. And I think it's so it doesn't strain a bit to say here or read that much into it. I think what the court is looking at is his deposition testimony and the court struck that. But his clerk testimony again, this is at forty eight, twenty and forty eight, nineteen of the year was not didn't contain any of that information about what he could and couldn't hear. He was very clear to the clerk investigators. And he said, I was present with Nurse Brantman when she discussed VDF Medical Department, the need for Nishimoto to be placed in a medical for a minimal observation due to his suspected overdose. That's what that's what Johnson testified to a clerk, which was before the court in Exhibit D to our summary judgment motion. And again, you got to consider that creates a tribal issue. In fact, even if you exclude it, let me be sure I understand that then what you're saying is that we because of the rulings that were made, excluding the testimony and you've not are excluding the evidence that was submitted, we can't consider the deposition testimony. Is that right? Yeah, you can take the deposition testimony, even though I disagree with that, but you can just look at the clerk and the clerk testimony is different. I think this goes back to this earlier point about whether or not you want us to look at the materials that were excluded or not. This was material that was excluded. No, it wasn't. Do you want us to look at it? No, Your Honor, the clerk testimony absolutely was not. With respect to the information that was excluded, are you conceding that it was correctly excluded or are you arguing that it was incorrect? No, Your Honor, I'm arguing I'm arguing that it was incorrectly excluded, but I'm also arguing that it's not necessary for that evidence to be considered because his testimony was mirrored in the clerk testimony that was given two years before his deposition in clerk in the investigation. He testified exactly as he testified in his deposition and that was not a time for rebuttal. Yes, I would like to save some time for rebuttal, thank you. OK, we'll hear from the other side. Who's speaking first? That would be me, Your Honor. Good afternoon, Your Honors, and may it please the court, Stephen Wysocki for Anne Brantman, nurse practitioner in this case. I think what I'd like to do and start with is based on my reading of the case law on the record in this case, this would be at least the first decision that that the an expert opinion is undisputed that the nurse practitioner met the standard of care at all times and yet somehow leads to a constitutional violation. I have no problem with that argument because the expert's opinion was based on Nurse Brantman's testimony about what she did or didn't do. And the appellant is arguing that there is such an issue, material fact that she didn't do that. So how could we even rely on the expert's testimony? Well, Your Honor, two points there. First, the appellant never filed an objection to Nurse Velouria's declaration in the district court below. That much we know for certain. Secondly, she didn't just rely on Anne Brantman's deposition testimony. She also looked at the clerk's statements and everything like that, that she recounted in her declaration, which is contained in the record. And she went through that with Deputy Johnson's clerk statement in particular, where he was expressing remorse about the fact that Nurse Brantman's recommendation was not thought. But but but counsel, didn't the district court credit the expert testimony and grant summary judgment on all counts because the district court found that it was an undisputed issue of fact that Nurse Brantman made the recommendation that's based on his finding that it was undisputed that Nurse Brantman had the conversation she claimed she had. That would be correct, Your Honor. He stopped. Judge Benito stopped his analysis at that point. He did not go into the case law on whether if the recommendation had not been made, whether this would contact or construe a denial of medical care. What is what is the significance of that error by and I take it you'll concede that that is an error, that it was undisputed. But what's the significance of that for our evaluation? Aren't we supposed to look at the actual evidence itself, irrespective of what the judge, how the judge characterized it? That is, we we dive down into that evidence itself. All right. Judge Benito's rulings on the evidentiary objections will be reviewed under abuse discretion. I do believe there is a logical connection. But do you? I propose Judge Bennett's comment. Do you say that that's correct, that it was undisputed? I do believe from a matter of expert opinion, that is correct, that she met the standard of care at all times. That's not the question that Judge Bennett was asking. The question that Judge Bennett was asking was whether or not it was undisputed that she communicated this. And that seems to me to be to some degree disputed in this case. In any event, the findings that the district court made seem to me to be perhaps erroneous, not perhaps erroneous. But our obligation is to look at the record itself. Your Honor, the record itself and what was submitted before the district court, you know, the points that the appellant made in her opening brief and the extension of what was beyond the record in front of Judge Benito's in the district court, exhibit W is a great example of this. Three pages of deposition testimony from Nurse Bella Zardo, who testified, you know, repeatedly. She did not recall anything about that day other than attending a county operation. But what you're asking, I think what Judge Bennett is asking is, is there in the record a genuine issue of material fact? It has to be material. That goes to the question that Judge Kruger was asking earlier about what's the constitutional court here. But that's the issue, not whether or not Homer nodded when he wrote his decision here. We've got to look at the facts that Homer was attempting to recall, don't we? Not based on the admissible evidence. There is no undisputed fact. OK, counsel. So with regard to the note that Nurse Brantman wrote, where she described in detail what happened, but didn't discuss at all this conversation. Why isn't an inference that is reasonably drawn in favor of the non-moving party that the reason she didn't write it in this three page note was because it didn't happen? Why isn't that a reasonable inference? Well, Your Honor, because the note itself met the standard of care, according to the undisputed expert testimony. Paragraph nine. Mr. Wysaki, that's a factual question that Judge Bennett is asking, not what the expert said about the underlying facts. But isn't the answer to that in the testimony that you gave that RN registered nurse sick call means per the verbal order or the recommendation I already gave to Vicky referring for staff to get Jason and put him in the med ISO. That's at ER 3815. That's absolutely correct, Your Honor, but to go back to Judge Bennett, but I think what the question we're asking is not who opines or even what the district judge says, but what is the underlying factual basis that's contested that we have to evaluate to make a determination of whether there is a genuine issue of material fact. And so returning, recurring to opining in whatever form isn't that helpful on that from that perspective? Yes, Your Honor. And in fact, we also have corroborating evidence from Deputy Johnson's testimony where in turn he's referencing a conversation that takes place between nurse Felizardo and nurse Brantman, that two to three minute conversation. So we do get it. Should that should that have been excluded? Your Honor, if I may, only eight lines of the deposition testimony of Deputy Johnson was excluded, not the totality. Only those eight lines were objected to. Yeah, the district, if I understand correctly, the district judge excluded the portion of the deputy's testimony saying that he didn't hear the nurse say this because he wasn't paying attention to the whole conversation. Am I mischaracterizing Judge Benitez's reason for excluding that eight line? No, Your Honor, that's correct. And how how is it that when someone testifies, I didn't hear a conversation that that is excluded because they may not have been paying attention? I mean, how is that on summary judgment excludable? It may be a perfectly permissible inference for a jury to draw that if a person wasn't paying attention, we shouldn't pay a lot of attention to them saying they didn't hear something. But how on summary judgment can you exclude it as a matter of law when he specifically says, I didn't hear that conversation and I was there? Because it's speculative at that point as to what was heard and what wasn't. I mean, that gets right to the heart of the evidentiary objection to those eight lines of deposition testimony from Deputy Johnson. So he's got a specific memory as to what he heard, but he cannot definitively state to what he doesn't recall. And I see my time is up unless there's further questions. I'll defer to Mr. Bloodworth. All right. Good afternoon, Your Honors, Brian Bloodworth on behalf of Defendant and Appley Correctional Physicians Medical Group. Unless there's any questions, I'll probably just spend one minute on the other orders at issue. And if I can yield the remaining time back to Mr. Wysocki on the issue of the motion for summary judgment, I'd like to first address and only address, unless there's any questions, the reply brief filed by the appellant where she raised the issue that there are potentially appealable issues with regard to a voluntary dismissal. I'd like to point out to this court that the issue that appellants has raised in our opening brief is not whether or not the order denying the motion for reconsideration, that order is not on appeal. Excuse me, let me rephrase. The order that's not on appeal is the actual order dismissing TPMG from the 1983 Causes of Action Claims 1 and Claims 4. The motion that is on appeal, the order that is on appeal is the motion for reconsideration. The cases which appellants has raised in the reply brief don't address the actual issue that was raised. The cases that are authority on this issue are the cases that I believe raised in the answering brief, Ackerman, a Supreme Court case, and Namizer, which is a second circuit case. I can go into more detail about those cases. I have a sort of a procedural question. I was a little confused why the parties were citing Rule 60B Stanford cases when this seems to be a Rule 54 type issue because it wasn't the final dismissal of all claims and parties. And so I was wondering what the standard was, I assume it's some type of abuse of discretion, but what cases address the dismissal of a single party while the case itself is a mistake that they made in agreeing to a dismissal early? We have not been able to find any cases discussing the issue of essentially an interlocutory dismissal on just a couple of claims. However, when you look at the dicta of, say, Ackerman, the Supreme Court case, where free and deliberate decisions should not be disturbed on a motion for reconsideration or Namizer, that the legal consequences of a stipulation should not be undone as a result of hindsight. Those are the types of opinions and decisions that this court can rely on to affirm the lower court's decision with regard to the motion which was brought before it, which was brought under Rule 60. So in Rule 60, of course, we allow corrections for negligence and mistake, which I guess is what Appellant is arguing here. Why was that not appropriate in this context? The rule, the motion was made under Rule 60B-2 of newly discovered evidence, and this must be evidence which must be newly discovered, must be made within due diligence of discovery, and must not change the disposition of the underlying order, in this case, the about the change of disposition. We cited to the case of Schwarz v. Fowler, a Fifth Circuit case, that when the court takes into consideration whether to undo an order for voluntary dismissal on a stipulated basis, they must look to see if there's any prejudice to the defendant. And the reason is because a voluntary dismissal, especially on a stipulation with prejudice, undoing that is the prejudice to the defendant, according to that Fifth Circuit case. Now, with regard to the due diligence element, the court found that there was no due diligence because plaintiff acquiesced with regard to discovery. The second amended complaint is what brought in CPMG, which was filed in January of 2018. It was not until June of 2018 that Appellant filed or, excuse me, served her first written discovery to the appellee. In this case, it was only two requests for production, which are within the record. And then there was only one deposition of Nurse Brantman. During that time, the appellant could have taken the deposition of anybody else within CPMG to test the training or to get additional discovery with regard to the training at CPMG. But the appellant did not do so. There was no... They deposed one of the doctors, I can't remember his name, who said one thing in the depot. And then when they finally got the discovery from CPMG, said something quite different about the relationship with CPMG in his interview. So there was some issue, at least that's what Appellant says, about having been misled by the deposition testimony. First and foremost, you're speaking of the deposition of Dr. Joshua, who is the county medical officer. And the emails were produced through discovery propounded onto the county. That discovery was not propounded onto CPMG. Secondly, the deposition of Dr. Joshua took place after Appellant requested the voluntary dismissal. It again goes to due diligence. If Appellant had decided to take the deposition of Dr. Joshua, that would have been potentially a different discussion. But because Dr. Joshua was not deposed until after, that goes to show that Appellant was not diligent in pursuing discovery on this issue or any others with regard to Dr. Joshua. So may I just understand what the state of the play is now with respect to that interlocutory order? Is it final or do we have on the record just a dismissal of some of the counts, but not all of the counts? There is a final judgment now in this case, and that came after the motion for summary judgment was decided. Right. And that was on the basis of the summary judgment treatment of Nurse Brampton? The final judgment was based on a variety of factors. First, the motion for summary judgment filed by Nurse Brampton. It was based on the dismissal of the county based on their settlement, and it was also based on the dismissal of the 1983 causes of action against CPMG. All of those together have led to the final judgment. All right. But it doesn't depend upon Nurse Brampton's summary judgment motion, does it? That is the new information that's been provided to here, whether diligently sought or not, goes to the county, not to county's activities or perhaps to your activities, but not to hers. That's my understanding as well, because CPMG was only left in the case after the dismissals as a result of vicarious liability for the negligence causes of action by Nurse Brampton. Okay. And thank you for your time, unless there's any other questions. All right. You have a couple of minutes left to rebuttal. Thank you. I just want to follow up on two very important points, following up with Judge Woodlock on the question of materiality. It does have to be a material point. Now, again, 1494 of the record, if an inmate denies suicidal ideation but has been identified by staff as having suicidal risk, first step, provide safety garment and safety blanket. That's why that's material. Once you put them into the ISP, once you put those protocols on them, you take away the instrumentality from which he killed himself. Okay. And so, just so I understand, when I look at 1494, it's going to tell me that she is obligated to make that recommendation. No, sir. And the failure to make that recommendation can be charged against her as negligence, or not negligence, but as a misconduct, constitutional misconduct. What I was addressing was, I thought, the point that you're asking is, why would it matter? What would happen if she had made that recommendation? And that will show you that if she had made the proper recommendation, it would have taken away his clothes. What is the obligation that she has to make that recommendation, if any? Well, that goes to the heart of the case, then. Does she have the heart? Does she have the obligation as a medical psychiatric provider to appreciate and convey suicidal risk? Where do I find the legal basis for that obligation? Well, we set that forth in the legal basis, Your Honor. The Ninth Circuit has plenty of cases on the obligation to appreciate and to convey the suicidal risk. As we were saying, appreciate is a term of art. I really want to understand that there's some place that I can look that says a nurse practitioner, under these circumstances, has an obligation to do what 1494 suggests other people are supposed to do. What the case is saying, Your Honor, and those are fully briefed, is the obligation for somebody who, a medical health provider, to recognize and convey the obvious risks of suicide. Counsel, didn't the defendant's expert report say that the reason that Nurse Brantman met the standard of care was because she did convey this information? Right. And that becomes a question of fact that the whole thing turns on. So, I mean, one of the bases of their expert report is the reason she didn't violate the standard of care is because we're going to assume what she says she said she actually said. Correct. And we would agree if she did convey it, recognize it and convey it, we got no issue. But that's a disputed material fact that should really go before a jury. If it is a disputed material fact, but let's assume that it is, there are alternative bases on which the expert opined, right? So, I think it was it was based on that set of facts, Your Honor. Not entirely, was it? That was my understanding of the expert reports. It was based solely on the fact that she recognized it and conveyed suicidal thoughts, suicidal, suicidal risk. That's what the expert decided. And in so doing, it was a safety cell, a padded, naked cell may not have been the place for him, but someplace stepped up like an EOH with these kind of protocols would have been the proper placement. And that's why the district court relied on the expert report because of that conversation, right? Correct. That was the foundation of the expert report. And the expert report did say at 1333 through 1334, this is Nurse Valoria further opining that placement in a medical observation cell was within the standard of care and that placement in a safety cell would have been inappropriate for a patient reportedly suffering from schizophrenic disorder. Right. Completely agree. But there is an alternative basis for treating both of the two alternative ways of looking at this for there to be a justification for it. Your Honor, the difference is placement in a medical observation bed with inmate safety protocols. That's the key. And you only get those if you convey a suicidal risk. So you just put him in a hospital bed. It's not the same as put him in a hospital bed with inmate safety protocols. And that's that's the key to this case. And just if I could, I know I'm over time, but with respect to CPMG, the judge cited it wouldn't have made a difference had we known. The only evidence in the record is my my declaration that says had I known there was this hot dispute between the parties, I would have never dismissed anybody. And so that's the only evidence before the court is I would have dismissed him had I known this was going on. And that and that is and that that's the only evidence that would have made a difference to the party who actually voluntarily dismissed me that I wouldn't have done that had I known this hot dispute. And we put Joshua's deposition in the testimony to show you, hey, this is what we're being told. We asked the guy, what's going on between you and CPMG? We got nothing. It was like everything's fine between me and CPMG. And that's exactly what we're told four days before the court entered his order. Had we known that there was a hot dispute, we could have pulled back the order. We never would have done that in the first place. And I think that was an abuse of discretion. But thank you so much for the indulgence. I think we have your argument. We think both parties in the case of Rochelle Nishimoto versus Anne Bracken and Correctional Physicians Medical Group Inc. is submitted. Thank you. Thank you.
judges: Ikuta, Woodlock, Bennett